# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
### TEXARKANA DIVISION

| | | |
|---|---|---|
| DUANE BENSON AND WIFE, | § | |
| SANDRA BENSON | § | |
| Plaintiffs, | § | |
| | § | No. 5:14-cv-161-JRG |
| v. | § | |
| | § | |
| RUSSELL'S CUTHAND CREEK | § | |
| RANCH, LTD., | § | |
| DUCKS UNLIMITED, INC., AND | § | |
| NATURAL RESOURCES | § | |
| CONSERVATION SERVICE | § | |
| Defendants. | | |

## MEMORANDUM OPINION AND ORDER

Before the Court is Defendant Natural Resources Conservation Service's Motion to Remand for Lack of Subject Matter Jurisdiction Pursuant to 28 U.S.C. 1447(c) (Dkt. No. 48). For the reasons stated below, this Court finds it has jurisdiction and the Motion is **DENIED.**

I.  **BACKGROUND**

Plaintiffs Duane and Sandra Benson ("Plaintiffs") are individuals residing in Red River County, Texas. They own a tract of land adjacent to Defendant Russell's Cuthand Creek Ranch, Ltd. ("Russell"). Russell is a Texas resident. Cuthand Creek flows through both the Benson and Russell property. Specifically, the creek flows across Plaintiffs' property and then passes on onto Russell's tract. Plaintiffs allege that in times of heavy rain, Cuthand Creek often temporarily floods much of their property but the flooding from Cuthand Creek quickly recedes due to the amount of surface area transporting the flood waters across Plaintiffs' property.

Defendant Ducks Unlimited, Inc. ("DU") is a non-profit organization dedicated to the conservation of waterfowl and other wildlife. On May 7, 2001, the Natural Resources

Conservation Service, a division of the United States Department of Agriculture ("NRCS"), entered into an agreement with DU—the "Cooperative Agreement" (Dkt. No. 1-6)—with the express purpose of furthering the mission of the Wetlands Reserve Program (WRP), which is to "restore and protect farmed wetlands, prior converted wetlands, wetlands farmed under natural conditions, riparian areas, and other degraded wetlands for landowners who have eligible land on which they agree to sell the government a conservation easement." Pursuant to the Cooperative Agreement, DU and NRCS agreed to work together to develop the Wetland Reserve Plan of Operations (WRPO), which is a hydrologic and vegetative restoration plan in compliance with NRCS standards and specifications. (*Id.*)

On January 30, 2002, the NRCS acquired a 30-year conservation easement across the Russell property as part of the WRP to "restore, protect, manage, maintain, and enhance the functional values of wetlands and other lands, and for the conservation of natural values including fish and wildlife habitat, water quality improvement, flood water retention, groundwater recharge, open space, aesthetic values, and environmental education." (Dkt. No. 17-1 at 1.) Accordingly, under this conservation easement, the United States acquired the right to "enter into the easement area to undertake, at its own expense or on a cost share basis with [DU] or other entity, any activities to restore, protect, manage, maintain, enhance, and monitor the wetland or other natural values of the easement area." (*Id.* at 2.) This easement permits the government to delegate "all or part of the management, monitoring, or enforcement responsibilities under [the] easement to any entity authorized by law that the [Commodity Credit Corporation] determines to have the appropriate authority, expertise and resources necessary to carry out delegated responsibilities." (*Id.* at 3.) As the easement contemplates, NRCS later designated DU to act regarding wetlands on the Russell

property. All of such restoration work on the Russell property was completed by DU under the terms and provisions of the Cooperative Agreement.

Sometime in late spring or early summer 2012, Plaintiffs allege that they began to notice that the levee system constructed by DU on the Russell tract had narrowed the natural water flow from the Cuthand Creek flood plain. They allege that such narrowed and constricted water flow diverted and impounded flood waters causing substantial erosion on the eastern boundary of Plaintiffs' property. (Dkt. No. 1-2, Ex. B-6 at 3–4.)

On March 6, 2014, Plaintiffs filed suit in the 6th Judicial District Court of Red River County, Texas against Defendant Russell. On December 1, 2014, Plaintiffs filed a First Amended Original Petition in the state court adding DU as a defendant. (Dkt. No. 1-2, Ex. B-6.) The petition alleges causes of action under Section 11.086 of the Texas Water Code, negligence in "designing, constructing or allowing the levee system to remain in place," a continuing temporary nuisance, and a temporary nuisance. (*Id.* at 4–5.)

On December 22, 2014 DU, removed the case to this Court pursuant to 28 U.S.C. 1442(a)(1). (Dkt. No. 1.) On March 3, 2015, Plaintiffs filed a Second Amended Complaint against Russell and DU. (Dkt. No. 17) On September 28, 2015, Plaintiffs filed a Third Amended Complaint naming the NRCS as an additional defendant. (Dkt. No. 30.)

On January 19, 2016, NRCS moved to remand this case for lack of subject matter jurisdiction pursuant to 28 U.S.C. 1447(c). (Dkt. No. 48) The propriety of such a remand is the subject to which the Court now turns.

## II. LEGAL STANDARD

Under Section 1442(a)(1), commonly referred to as the Federal Officer Removal Statute, "[t]he United States or any agency thereof or any officer (or any person acting under that officer)

of the United States or of any agency thereof" may remove a civil action commenced in state court "for or relating to any act under color of such office or on account of any right, title or authority claimed under any Act of Congress for the apprehension or punishment of criminals or the collection of the revenue." 28 U.S.C. 1442(a)(1). The removing party bears the initial burden of showing that removal is proper. *See Faulk v. Owens-Corning Fiberglass Corp.*, 48 F. Supp. 2d 653, 658 (E.D. Tex. 1999).

To properly remove a case under the Federal Officer Removal Statute, the removing party must show that the removing contractor defendant: (1) is a "person"; (2) acting at the direction of an officer of the United States and that a causal nexus exists between the defendant's actions under color of federal office and plaintiff's claims; and (3) asserts a colorable federal defense. *See id.* at 659 (citing *Winters v. Diamond Shamrock Chemical Co.*, 149 F.3d 387, 398-400 (5th Cir. 1998)). "[R]emoval of the entire case is appropriate so long as a single claim satisfies the federal officer removal statute." *Savoie v. Huntington Ingalls, Inc.*, 2016 WL 1138841, at *5 (5th Cir. March 22, 2016).

The purpose of the Federal Officer Removal Statute is to guarantee a federal forum for cases in which a federal official is entitled to raise a defense arising out of his or her official duties thereby putting federal interests at stake. *See id.* at *2; *Winters*, 149 F.3d at 397. Accordingly, the Court interprets the statute liberally in favor of removal, and resolves any factual disputes in favor of jurisdiction. *See Cole v. Northrop Grumman Ship Sys., Inc.*, 07-cv-3049, 2008 WL 2651428, at *2 (E.D. La. July 7, 2008).

III.    ANALYSIS

The First Amended Original Petition (the "operative Complaint") provides the basis of evaluating whether removal was proper since it was the complaint existing at the time of removal. *See Faulk*, 48 F. Supp. 2d at 657.

The Court finds there are at least two causes of action within the operative Complaint that support removal jurisdiction under Section 1442(a): negligence and a violation of the Texas Water Code Violation. Since the parties agree that DU is a person under 1442(a), the Court only addresses the second and third parts of the test: (1) whether DU "acted under" the direction of a federal officer, and whether a causal nexus exists between the defendant's actions under color of federal office and plaintiff's claims; and (2) whether DU asserts a colorable defense to Plaintiff's claims.

### 1.    Negligence

As an initial matter, the Court addresses the scope and nature of Plaintiff's negligence allegations because, as NRCS correctly notes, "[t]he specific allegations in Plaintiffs' complaint matter." (Dkt. No. 56 at 2.) NRCS frames Plaintiff's negligence allegations as limited to the design and construction of the levee system. (*See* Dkt. No. 48 at 1) ("Plaintiffs' state court action, at the time of its removal to this Court, alleged that Defendant Ducks Unlimited, Inc. (DU) negligently designed and constructed levees that caused damage to their property"); (*id.* at 3) ("Plaintiffs' First Amended Petition . . . alleged that DU negligently designed and constructed levees that caused damage to their property."). In other words, NRCS argues that Plaintiffs allege a breach of duty that arose during the course of designing and constructing the levee system, for example, using unsuitable materials or not building a wall high enough. While DU does not challenge this characterization, the Court has "an independent obligation to determine whether subject-matter jurisdiction exists, even in the absence of a challenge from any party." *Arbaugh v.*

*Y&H Corp.*, 546 U.S. 500, 514 (2006).   As a result, the Court must consider the issue of whether NRCS's characterization of the negligence allegations is accurate and complete.   The Court concludes that it is not.

Here, Plaintiffs allege negligence "in designing [and] constructing" the levee system. (Dkt. No. 1-2 at 28.)   The Court finds that on the face of the operative Complaint, Plaintiffs are alleging that it is the *act* of designing and constructing the levee system at this location that constituted negligence.   Said another way, Plaintiffs are alleging negligence arising from the placement and location of the levee system including its existence on the Russell property, not simply its design or the manner of its construction.   While the operative Complaint is not clear whether the specific location chosen or the Russell property generally could not support a levee system or wetland development, or whether the placement of *any* levee system at this location on the property would have been negligent no matter how carefully it was constructed, it is clear that Plaintiffs' complaint is not that a substandard levee resulting from a poor design or improper construction was built on Plaintiffs' land.   Plaintiff's allegations are that a levee system located where this one is located on the Russell tract has caused and will continue to cause the same type of diversion and impoundment of flood waters that are eroding their property. *Cf. Peacock v. Missouri-Kansas Texas R. Co. of Texas*, 148 S.W.2d 250, 251 (Tex. Civ. App. 1941) ("[T]he jury found substantially as follows . . . the plaintiffs constructed levees upon their land in such manner as to concentrate water and to cause the injury and damage complained of; the construction of such levees was negligence; and such negligence was a proximate cause of plaintiffs' damage.").   The Court's broader reading of Plaintiffs' claim is supported by its direct alignment with the remainder of the allegation that NRCS overlooks, that Defendants are negligent for ". . . allowing the levee system to remain in place." (Dkt. No. 1-2 at 28.)   Further, there is nothing in the operative

Complaint which might relegate Plaintiffs' claim to a mere defect in design or construction, as NRCS contends.

The Court must construe Plaintiffs' complaint in favor of retaining jurisdiction. Here, consistent with the principles underlying Section 1442(a) favoring federal jurisdiction, the Court construes Plaintiffs negligence allegation broadly as encompassing not only an allegation that Defendants negligently designed and/or constructed the levee system, but an allegation that the very act of installing the levee system at its present location on the Russell property breached a duty of care.

### a. "Acting Under" and Causal Nexus

The "acting under" element requires a close relationship between the contractor and government involving detailed regulation, monitoring, or supervision. *See Watson v. Philip Morris Companies, Inc.*, 551 U.S. 142, 153 (2007). Where, in the absence of a contract, the Government itself would have had to perform the contracted task, the contractor "acts under" the direction of the government so long as that task is closely regulated, monitored, or supervised by the government, as opposed to simply a company subjected to intense regulation. *See id.* On the other hand, mere compliance with laws, rules, or regulations will not suffice. *Id.* Courts in this Circuit have interpreted the "acting under" element as requiring the federal officer or agency to exercise "direct and detailed control." *See Reed v. Fina Oil & Chem. Co.*, 995 F. Supp. 705, 710 (E.D. Tex. 1998); *Preston v. Tenet Healthsystem Mem'l Med. Ctr., Inc.*, 463 F. Supp. 2d 583, 590 (E.D. La. 2006), *aff'd*, 485 F.3d 804 (5th Cir. 2007); *see also Guillory v. Ree's Contract Serv.*, 872 F. Supp. 344, 346 (S.D. Miss. 1994) (private entity acts under a federal officer if it "acted sufficiently under the direction of a federal officer in the performance of the acts that form the basis of the suit").

7

Under either reading of Plaintiffs' negligence allegations, the Court finds that NRCS exercised sufficient "detailed supervision and control" over the design and construction of the levee system to meet this element. A review of the evidence submitted by the parties demonstrates that DU's relationship to NRCS was more than a quasi-contractor. In actuality, DU was a partner with NRCS and in many ways stood fully in the place of the government, "helping the Government to produce an item that it needed" and "perform[ing] a job that in the absence of a contract with a private firm, the Government would have had to perform." *Watson v. Philip Morris Cos., Inc.*, 551 U.S. 142, 153–54 (2007) (quoted in *Wilde v. Huntington Ingalls, Inc.*, 616 F. App'x 710, 713 (5th Cir. 2015)).

The starting point is the Cooperative Agreement. The Agreement delineates the relationship between NRCS and DU generally; it is not project specific. However, neither party disputes that the Cooperative Agreement governed the working relationship between NRCS and DU on the Russell project. Under the Cooperative Agreement, NRCS contributed 90% of the costs for the WRP and DU contributed 10%. (Dkt. No. 1-6 at 3.) Among other things, the Cooperative Agreement vested NRCS with broad supervisory control over alternative designs, materials to be used, and any modification or change to the Wetland Reserve Plan of Operations; required that DU complete a design and checkout sheet for all structural and vegetative practices; required that NRCS to provide preliminary conceptual plans, specifications for restoration plans, and compliance-check worksheet training; and made NRCS responsible for obtaining all permits necessary to implement approved designs. (*Id.* at 3-5.) Under the Agreement, NRCS also agreed to conduct periodic inspections and provide programmatic review on all construction work to ensure performance that meets standards and that WRP procedures are followed. (*Id.*)

DU also provides two affidavits demonstrating the NRCS's supervisory control over the Russell project. The first affidavit is from Mr. Jerry Ince, a former NRCS and DU engineer, and the primary DU design engineer responsible for constructing the levee systems at issue. Mr. Ince lists a number of ways NRCS typically exercised authority and control over restoration projects, including the Russell project. (*See* Dkt. No. 54-1.) Some of the ways in which Mr. Ince states NRCS exercised discretion over the WRP—and specifically the Russell project—include: "drafting the initial design of the wetland project" (*Id.* at ¶11(a)); "estimating the costs of materials for the project" (*id.*); "selecting the type of wetland that would be constructed (levees, excavations, beams, etc.)" (*id.*); reviewing topographical maps and hydrology testing prior to commencing the project (*id.* at ¶11(b)); providing software that helped determine specifications for pipes, risers, and levees (*id.* at ¶11(c)); collaborating in a "back and forth" manner with DU on design (*id.* at ¶11(d)); approving "each and every characteristic of the design process" and any significant changes to the design (*id.* at ¶¶ 11(d), (h)–(m)).

The second declaration is from DU employee and former NRCS employee Mr. Bob Massey. (Dkt. No. 54-5.) It further explains the degree to which NRCS supervised the project and the degree to which DU relied on government specifications. Mr. Massey's declaration explains that "NRCS developed specific criteria, including soil maps, for classifying farmland that would be suitable for a wetland. Once the NRCS received an application, they would evaluate whether the property, based on its own soil maps and onsite field reviews, was an appropriate candidate." (*Id.* at ¶ 5.) He further explains that the NRCS local field office was responsible for completing the Wetland Restoration Plan Operation ("WRPO"), the plan that specifies the type of hydrology and the manner in which the WRP land will be restored, protected, enhanced, maintained, and managed. (*Id.* at ¶ 8.) "The NRCS then may conduct the engineering design and surveys

required for installation of conservation practices or measures outlined in the WRPO or may engage with DU or another cooperating partner to complete the project." (*Id.* at ¶ 9.) In this case, NRCS engaged with DU. Massey states, "[t]ogether, the two entities work hand-in-hand to develop the final design and plans for the wetland . . . . However, the NRCS is ultimately responsible for ensuring that WRP objectives are fully met and is the final authority regarding the use of WRP funds and the practices and activities prescribed on WRP land." (*Id.* (citing National Planning Procedures Handbook and the WRP Manual at 514.41(C)(2)). In addition, Massey's declaration also states that: DU had no discretion over the materials it uses or whether to comply with NRCS's mandatory approval process (*id.* at ¶ 13); NRCS is involved in every step and has total discretion to approve or reject DU's work (*id*. at ¶ 12–14); that no design plan can be executed without NRCS's analysis, input and approval (*id.* at ¶ 13); and that DU performed work identified in plans approved by NRCS at the locations shown on the plans (*id.* at ¶ 20).

NRCS disputes the weight of this evidence presented by DU. It argues that these declarations consist solely of broad and conclusory statements and that DU has pointed to "no mandatory specification that NRCS required in the design or construction of the levees that precluded DU from designing or constructing the dikes differently to avoid the alleged harm of which Plaintiffs complain." (Dkt. No. 56 at 2–3.) The Court disagrees. The affidavits provided by DU are not conclusory since they cite and rely on the government's specifications (and although these specifications are voluminous they are not conclusory). More to the point, these specifications corroborate the terms of the Cooperative Agreement itself. Moreover, the content of these affidavits is sufficiently detailed, and is well within the scope of the affiants' knowledge and experience as both former NRCS and DU engineers. Other courts have relied on similar

affidavits to substantiate proper removal. *See, e.g.*, *Madden v. Able Supply Co.*, 205 F. Supp. 2d 695, 700 (S.D. Tex. 2002) (relying on affidavit of former marine engineer).

The Court also finds the contrary evidence presented by NRCS to be less persuasive. NRCS relies primarily on the declaration of Ms. Kristi Mashburn to show that NRCS did not exercise day-to-day supervisory control over the project. (Dkt. No. 48-2.) Ms. Mashburn is currently the District Conservationist for the NRCS in Cooper Texas, and from 2002-2007 was the District Conservationist in Clarksville, Texas. (*Id.* at ¶2.) As District Conservationist in Clarksville, Texas, she was responsible for the administration of NRCS programs in Red River County, Texas. (*Id.*) Ms. Mashburn declares that no NRCS employee supervised or inspected the restoration work being done on the WRP easement. (*Id.* at ¶7.) Ms. Mashburn was not an NRCS engineer concerned with field work, but was a local administrator primarily concerned with paperwork.

In reply, NRCS offers the declaration of Mr. John Mueller, a State Conservation Engineer, who states that there are almost no NRCS files showing the level of involvement Mr. Ince describes, save an August 13, 2003 NRCS letter to Mr. Ince. (*See* Dkt. No. 56-1.) That letter—sent to not only to Mr. Ince but ten other NRCS employees—further supports NRCS direct and detailed control over the construction of the levees. The letter reveals that an NRCS engineer, Mr. Gerald Krafka, requested clarification on two items concerning the Russell project. First, he states that "[s]ufficient structural analysis should be performed to ensure that the riser[s in Levee 1, Unit 1] withstand all forces acting on it throughout its performance range." (*Id.* at 6.) Second, Mr. Krafka states that the design report for Levee 1, Unit 1 will qualify the site as an inventory-sized embankment, but that 98% of the embankment is less than 3 feet and that the normal water depth is only 18-inches, therefore exempting the site from inventory status. Both of these items plainly

11

reflect NRCS involvement in the finer points of designing and changing the designs of the levee system. The letter concludes with Mr. Krafka asking Mr. Ince to contact the WRP Program Manager for availability of funds prior to beginning with contracting activities, and to contact Jerry Walker, an NRCS engineer, so that he can obtain the relevant permits. This evidence reflects the type of detailed and supervisory control outlined in the Cooperative Agreement and supported by the DU affidavits.

The Court concludes that DU has met its burden of showing the "acting under" and causal nexus elements of the removal test. Insofar as Plaintiffs' negligence allegations are construed broadly, the connection between the negligence allegations and the government is plain. There can be no dispute that the government specified and required that a levee system be built on the Russell property as part of the WRP and that it delegated that responsibility to DU while maintaining control over the project. Further NRCS, not DU, determined that the Russell property was suitable for a wetland. (Dkt. No. 54-5 at ¶ 5.) Since the harm alleged arises not from a defect in the levee system but from the installation of a levee system working as intended, NRCS is clearly a culpable actor. If the allegations are construed narrowly, and limited to defective design or defective construction of the levee system, the Court still finds DU's showing to be sufficient. The Court finds the affidavit of Mr. Ince, the affidavit Mr. Massey, and the supporting documentation carry substantially more weight than the declarations and documents submitted by NRCS. First, to the extent there are factual conflicts, the Court resolves them in favor of retaining jurisdiction. Second, the Court finds that DU's witnesses bear more credibility than the NRCS witnesses. Additionally and though not a focus of the parties' arguments to the Court, it is difficult to ignore that NRCS provided the vast majority of the money (90%) for this project and when determining issues of ultimate control, the maxim "follow the money" is often instructive.

On balance, the Court finds that DU "acted under" NRCS because the government had a sufficiently detailed role in planning, developing, and approving specifications for the WRPO and the levee system and that some decision made at least in-part by the NRCS could have caused Plaintiffs' harm.

In this case, the causal nexus inquiry largely merges with the "acting under" analysis. However, simply because a contractor defendant acts under the direction of a federal officer does not mean that there is a causal nexus. For example, in *Faulk v. Owens-Corning Fiberglass Corp.*, 48 F. Supp. 2d 653, 661 (E.D. Tex. 1999), plaintiffs alleged injury from asbestos exposure at various facilities owned or operated by the defendants and brought causes of action under state law for negligence, specifically a failure to warn of the dangers of asbestos. *Id.* at 656–57. The court found no causal nexus, since even assuming that there was a federally-controlled production of Avgas, butadiene, and steel (the products made at the facility under federal government specifications), and even though the government specified how to make these products, there was no connection between the product made at the facility and the failure to warn about asbestos, because "the federal government did not prevent Defendants from taking their own safety precautions heeding state-law standards above the minimum standards incorporated in their federal contracts." *Id.* at 663. The takeaway from these types of cases is that notwithstanding detailed government specifications given to a government contractor for a product or action, the contractor cannot avoid liability where there is an action independent from the government's requirements or control that would eliminate liability.

NRCS appears to make this argument and argues that DU had full latitude to exceed NRCS specifications. (Dkt. No. 56 at 5–6.) In this case and considering the present record, the Court does not find this argument persuasive. For reasons stated *supra*, the government involvement

appears to go beyond merely providing basic, minimum standards, specifications, or guidelines, although that is certainly part of the government's involvement. Here, the evidence suggests that NRCS had a key role in the design of the WRPO and importantly, any modification in design required NRCS approval. In other words, DU did not necessarily have discretion to deviate from that which the government directed, including both the design or construction specifications as well as the placement and location of the levee system itself.

### b. Colorable Defense

DU must also show that it has a colorable federal defense to Plaintiffs' negligence allegations. It need not prove the merits of the federal defense at this stage, but need only show colorable applicability to plaintiff's claims. *Winters v. Diamond Shamrock Chem. Co.*, 149 F.3d 387, 400 (5th Cir. 1998). As such, the "defense need only be plausible; its ultimate validity is not to be determined at the time of removal." *Magnin v. Teledyne Continental Motors*, 91 F.3d 1424, 1427 (11th Cir. 1996).

In the removal notice, DU relies on governmental contractor immunity based on *Ackerson v. Bean Dredging LLC*, 589 F.3d 196 (5th Cir. 2009). (Dkt. No. 1 at 5-6.) To prevail with the government contractor defense, DU must show that NRCS authorized work that caused Plaintiffs' injury. Specifically, immunity applies where: (1) the contract involves a public-works project; (2) the action causing the alleged harm was taken pursuant to contracts with the federal government that were for the purpose of furthering projects authorized by acts of Congress; and (3) the plaintiffs do not allege that the contractor exceeded his authority or that it was not validly conferred. *See id.* at 204–08. DU did not address *Ackerson* during the briefing, but again, the Court is mindful of its independent duty to assess the matter as it relates to the Court's subject matter jurisdiction.

14

If Plaintiffs' negligence claims are construed broadly, the application of the *Ackerson* defense is straightforward. In fact, this case is indistinguishable from *Yearsley* and *Ackerson*. "In *Yearsley*, a landowner asserted a claim for damages against a private company whose work building dikes on the Missouri River pursuant to its contract with the Federal Government had washed away part of the plaintiff's land." *Campbell-Ewald Co. v. Gomez*, 136 S. Ct. 663, 673 (2016), as revised (Feb. 9, 2016). The Court held that the contractor could not be liable to the landowner because "the work which the contractor had done in the river bed was all authorized and directed by the Government of the United States" and "performed pursuant to the Act of Congress." *Yearsley v. W.A. Ross Cost. Co.*, 309 U.S. 18, 20 (1940). Also in *Ackerson*, the contractor was contractually directed and authorized by the government to perform the work—to dredge the Mississippi River Gulf Outlet (MRGO) in furtherance of a public project—about which plaintiffs complained. (Dkt. No. 48 at 20.)

The *Ackerson* defense fails when the contractor exceeds his authority or when the authority was not validly conferred. *See Campbell-Ewald Co.*, 136 S. Ct. at 673. That is not the case here. DU was authorized to construct the levee system pursuant to a contract with the federal government in furtherance of a public works project designed to protect and restore wetland. What is being complained about is that constructing the levee system at its present location on the Russell property was negligent, and there is no dispute that DU had the authority to build a levee system on the Russell property in furtherance of the WRP.

Under the narrow construction the question is closer, but the answer is the same. NRCS argues that DU was not authorized to cause erosion or harm to adjacent land, but that argument begs the question. The question is not whether NRCS authorized or required DU to harm adjacent lands, but rather whether NRCS authorized a specific design or action that proximately

caused erosion or harm to adjacent land. While an absolute answer to that question at this stage is unclear—prior to discovery, it is too early to tell—one can reasonably speculate, based on the relationship between DU and NRCS, and NRCS's role in evaluating, selecting, and supervising any changes to the restoration plans, that the government directly authorized or directed DU to do something or change something that had the proximate effect of causing harm to Plaintiffs land. It is certainly plausible, and that is enough.

DU's contractor defense under *Boyle* is also plausibly meritorious. As NRCS correctly argues, "[t]he [*Boyle*] inquiry largely merges with the question of whether DU 'acted under' Government control and under the Government's 'color of office' in designing and constructing the levees at issue here." (Dkt. No. 56 at 7.) A contractor defense based on *Boyle* requires the defendant contractor to show (1) the United States approved reasonably precise specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States. *Louisiana United Bus. Ass'n Cas. Ins. Co. v. J & J Maint., Inc.*, 15-cv-1769, 2015 WL 5638083 at *4 (W.D. La. Sept. 24, 2015) (citing *Boyle v. United Technologies Corp.*, 487 U.S. 500, 512 (1988)). Stripped to its essentials, a *Boyle* defense is fundamentally a claim that "the Government made me do it." *In re Katrina Canal Breaches Litig.*, 620 F.3d 455, 464 (5th Cir. 2010) (internal quotations omitted).

NRCS disputes whether the cited Field Office Technical Guide specifications were reasonably precise. (Dkt. No. 56 at 5.) In this context, reasonably precise means "discretion over significant details and all critical design choices will be exercised by the government" or that "it is evident that the government was the primary agent of decision" over the alleged wrongful conduct. *In re Katrina Canal Breaches Litig.*, 620 F.3d 455, 461, 464 (5th Cir. 2010). "If the

government approved imprecise or general guidelines, then discretion over important design choices would be left to the government contractor," *Trevino*, 865 F.2d at 1481, and the *Boyle* defense fails.

In *In re Katrina*, the Fifth Circuit held that specifications from the US Army Corps of Engineers authorizing the use of on-site material as the primary source of backfill material, and off-site backfill material as a backup, were not reasonably precise for two reasons. *See In re Katrina Canal Breaches Litig.*, 620 F.3d at 462–65. First, regarding the on-site backfill, the Court held that the specifications did not specify how the contractor should parse through all of the on-site material to choose which was suitable for backfill, nor did the specification mandate the backfill material or the precise procedures to test material suitability. *Id.* at 462. Given the wide variety of material available to be used as backfill material, the backfill specifications were not reasonably precise. *Id.* Second, regarding the off-site backfill material, the specifications provided no reasonably precise instructions regarding the composition of the off-site backfill material. *Id.* at 462–63. On both of these points, the Court relied in part on deposition testimony taken during the course of discovery.

The Court finds *In re Katrina* to be persuasive and on point except in one key respect. In reversing summary judgment, the Fifth Circuit had the benefit of full discovery and a developed record. Here, after full discovery, NRCS's argument may ultimately prove meritorious, and any defense based on *Boyle* may fail. However, a record developed through complete discovery might show that DU created reasonably precise specifications in conjunction with NRCS that NRCS subsequently approved. Again, it is too early to tell. For now, DU has put forth sufficient evidence in affidavits and documents cited above to make either outcome plausible. At this early stage, that is adequate. *See Bennett v. MIS Corp.*, 607 F.3d 1076, 1089 (6th Cir. 2010).

17

### 1.  Texas Water Code

The parties focus much of their briefing on Plaintiffs' negligence theory.   The operative Complaint, however, advances multiple theories of recovery independent to the designing of the levee or of a duty of care.   Removal is proper based solely on Plaintiffs' negligence allegations. However, the Court finds that Plaintiffs' Texas Water Code Claim[1] also provides an independent and perhaps even a clearer basis for removal jurisdiction.

Section 11.086, "Overflow caused by Diversion of Water," of the Texas Water Code (the "Texas Water Code claim") reads:

(a)     No person may divert or impound the natural flow of surface waters in this state, or permit a diversion or impounding by him to continue, in a manner that damages the property of another by the overflow of the water diverted or impounded.

(b)     A person whose property is injured by an overflow of water caused by an unlawful diversion or impounding has remedies at law and in equity and may recover damages occasioned by the overflow.

Tex. Water Code Ann. § 11.086.   "Damages are allowed under section 11.086 when '(1) a diversion or impoundment of surface water, (2) causes, (3) damage to the property of the plaintiff landowner.'" *Texas Woman's University v. The Methodist Hosp.*, 221 S.W.2d 267, 277 (Tex. App. 2006) (quoting *Dietrich v. Goodman*, 123 S.W.3d 413, 417 (Tex. App. 2003)).   The Texas Water Code claim imposes a duty of strict liability. *Id.* at 283.

### a.     "Acting Under" and Causal Nexus

The "acting under" and causal nexus elements of the Federal Officer Removal test are met. Here, the Court is substantially guided by the Fifth Circuit's recent decision in *Savoie v. Huntington Ingalls, Inc.*, 2016 WL 1138841 (5th Cir. March 22, 2016).   In *Savoie*, the plaintiff

---

1 In light of the Texas Water Code claim, the Court elects not to reach the question of whether removal is proper based on Plaintiffs' nuisance claims.

shipyard worker brought a state-court action against a shipyard owner. *Id.* at *1. The shipyard owner contracted with the federal government to produce Navy and Coast Guard vessels. *Id.* Plaintiff Savoie worked as both a clean-up laborer and a painter-blaster on vessels the shipyard constructed for the Navy and Coast Guard. *Id.* The government contracts required the use of asbestos and the Navy used a quality control system to ensure the shipyard complied with the government requirements. *Id.* Savoie contracted mesothelioma and brought numerous claims against the shipyard sounding in negligence as well strict liability. *Id.* The shipyard defendant removed the case under the Federal Officer Removal Statute. *Id.*

Writing for the Court, Judge Costa first agreed with the district court and held that Savoie's negligence claims failed because, in that case, the government's mandate to use asbestos did not *necessarily* cause any of the grounds for negligence asserted, for example, failing to warn of the dangers of exposure to asbestos. *Id.* at *4–5. Notwithstanding the government's asbestos requirements, the shipyard operators could have still warned plaintiffs of the dangers of asbestos. *Id.*

However, the *Savoie* court found a causal nexus for the strict liability claims. It surmised that under Louisiana's wrongful death statute, a strict liability plaintiff bringing an asbestos-related death claim need only prove that (1) the asbestos-containing products caused damages that were in the care, custody, and control of the defendant; (2) that the asbestos-containing products had a vice, ruin, or defect that presented an unreasonable risk of harm; and (3) that the vice, ruin, or defect was the cause-in-fact of the plaintiff's damages. *Id.* at *6. These strict liability claims "rest[ed] on the mere use of asbestos, and that use at the shipyard was pursuant to government directions via contract specifications. Unlike claims based on

19

negligence, those based on strict liability d[id] not turn on discretionary decisions made by the shipyard." *Id.*

This case is no different. The evidence shows that DU's construction of this levee system was pursuant to government direction via plans and contract specifications incorporating the levee system, and that those plans were approved by the government. Like the asbestos claim in *Savoie*, Plaintiffs' Texas Water Code claim sounds in strict liability, that is, the claim does not rely on discretionary decisions made by DU, but only the mere use and construction of the levee system. To find that DU acted under government direction and that there is a causal nexus between the harm alleged and the government direction, all that is needed under the Texas Water Code claim is care, custody, and control of the levee system by NRCS, which levee system is the cause-in-fact of the harm to Plaintiff's real property. That is clearly present here. The government paid for almost all of the levee system, holds and controls the easement on which the levee system is built, and supervised and approved DU's work to ensure compliance with government specifications and contractual requirements. DU could receive no payments until the government certified that all contractual requirements had been met. Given this, the "acting under" and causal nexus elements of the Texas Water Code cause of action are clearly satisfied.

### b. Colorable Defense

The Court finds that DU recites a colorable federal defense to the Texas Water Code claim under *Ackerson* and/or *Boyle* for at least the reasons stated *supra* with respect to the Plaintiffs' negligence claim. Put simply, there can be no reasonable dispute that the contract and specifications under the contract called for DU to build a levee system for the government on the Russell property pursuant to a public project, and that DU did not exceed its authority by building the levee system.

**IV.** **CONCLUSION**

For the reasons set forth herein, Defendant Natural Resources Conservation Service's Motion to Remand for Lack of Subject Matter Jurisdiction Pursuant to 28 U.S.C. 1447(c) (Dkt. No. 48) is hereby **DENIED**.

Additionally, the Court certifies pursuant to 28 U.S.C. § 1292(b) that this case involves "a controlling question of law as to which there is a substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation." If an application is made to the Court of Appeals for the Fifth Circuit within ten days after the entry of this Order, the case will be stayed pending disposition at the appellate court. If this Order is not appealed, the Court **ORDERS** the parties to jointly file a proposed Scheduling Order within 21 days from the date this Order.

**So ORDERED and SIGNED this 3rd day of May, 2016.**

RODNEY GILSTRAP
UNITED STATES DISTRICT JUDGE